Filed 3/21/23  In re M.S.  CA1/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re M.S. a Person Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>L.D. and A.S.,<br><br>        Defendants and Appellants. | A166035<br><br>(City & County of San Francisco Super. Ct. No. JD19-3332) |

L.D. (mother) and A.S. (father) appeal several juvenile court orders. They argue the court erred by denying mother's modification petition requesting reunification services and in-person visits with M.S., her three-year old son.  (Welf. & Inst. Code, § 388; undesignated references are to this code.)  In addition, they contend the court erred by terminating mother's parental rights after it declined to apply the beneficial relationship exception. We reject both contentions.  We do, however, agree with mother and father's final argument — the court and San Francisco Human Services Agency (Agency) prejudicially failed to comply with their inquiry obligations under

the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.; ICWA[1]) and related California law.  We conditionally reverse the order terminating parental rights and remand the matter solely for compliance with ICWA.

## BACKGROUND

The history of this dependency proceeding is set forth in this court's two prior opinions, which we incorporate here by reference.  (*L.D. v. Superior Court* (Feb. 26, 2021, A161424) [nonpub. opn.] [denying petition for writ of mandate seeking to vacate orders removing M.S. from mother's care, bypassing her for reunification services, and requesting a stay of a permanency hearing]; *In re M.S.* (Apr. 28, 2022, A162955) [nonpub. opn.] [affirming order denying a § 388 modification petition seeking reunification services and weekly visitation].)  We briefly summarize the facts and provide details relevant to this appeal.

In February 2020, the juvenile court sustained the Agency's allegations that M.S. was at risk of physical or emotional harm based on mother's history of mental health and substance abuse, father's abuse of mother and ongoing contact despite an active criminal protective order against father, and mother's child welfare history.  The court declared M.S. a dependent, ordered mother's compliance with the criminal protective order, and ordered family maintenance services for mother.  The services included individual therapy, domestic violence programming, parenting education, a residential treatment program, and weekly random drug testing.

But one month later, another incident of violence between mother and father ended with him absconding with M.S.  As a result, the juvenile court

---

[1] Because "ICWA uses the term 'Indian,' we do the same for consistency, even though we recognize that other terms, such as 'Native American' or 'indigenous,' are preferred by many."  (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 739, fn. 1 (*Benjamin M.*).)

ordered mother to bring M.S. to the Agency — an order mother violated. Police discovered M.S. in mother's home six weeks later; police forcibly entered the home and found it in a condition hazardous to children. The court removed M.S. from mother's care, placed the child in foster care, bypassed reunification services for mother, and scheduled a permanency hearing (§ 366.26). The court also granted mother one hour per month of virtual visitation with M.S. In addition, the court determined ICWA did not apply.

Mother filed a modification petition (§ 388) in both May and June 2021, seeking reunification services and weekly in-person visitation with M.S. The juvenile court summarily denied the first petition without a hearing after determining there was no prima facie evidence of changed circumstances. The court likewise rejected mother's second modification petition.

In December 2021, mother filed another modification petition, again seeking reunification services and weekly in-person visits with M.S. The petition alleged mother had been sober for one year and had not had any contact with father in over 18 months. Despite acknowledging some of mother's positive changes, the Agency did not believe they were significant enough since mother did not fully address her history of domestic violence at the hands of others. Police reports in January 2022 indicated mother obtained a restraining order against a man with whom she was in a relationship. The man kicked in mother's door several times and threatened her with violence. The Agency noted this escalated the risk to M.S. if the court ordered reunification services or in-person contact.

The Agency also expressed concern about the potential for violence between mother and father. For example, mother reported she had no contact with father after he was released from prison in February 2022. But

3

within eight days of her report, father began using mother's address to receive benefits. After an Agency social worker notified mother of this issue, father changed his address to the building next to mother's. Mother and father were also observed walking together in May 2022 at an intersection near where mother resided. At that time, officers arrested father after finding him in possession of a loaded, untraceable gun and narcotics. The police report identified mother as father's "girlfriend." Social media videos and photos similarly documented their continuing contact despite mother and father's assurances to the contrary. In July 2022, the sheriff department's electronic monitoring program reported father was registered to mother's address in Pacifica. The social worker feared mother was relapsing into a dangerous pattern — reconnecting with father in a relationship that would devolve into domestic violence and substance use.

Throughout this period, mother and M.S. continued to have monthly supervised virtual visits. Mother sang songs, asked M.S. questions, they worked on the alphabet together and identified parts of the body and colors, and M.S. showed mother his toys. They said "I love you" to each other. Although mother tried to engage M.S. with age-appropriate activities, M.S. would sometimes interact with his foster care parent offscreen. Redirecting M.S.'s attention back to mother was difficult due to M.S.'s age.

According to the Agency, M.S.'s demonstrated indifference to mother indicated he lacked emotional connection to her. Rather, M.S. repeatedly called his foster parents "mama" and "papa" since they had been his stable caregivers for two years, providing him with necessary care and meeting all his needs. Based on these interactions, the Agency concluded severing M.S.'s relationship with mother would not be detrimental to him. Instead, it would be beneficial for his long-term safety, permanency, and well-being.

4

At a modification hearing that spanned several days in July and August 2022, mother presented testimony from numerous witnesses, including her therapist, addiction treatment sponsor, work supervisor, and her brother and sister — both who declared mother had completely turned her life around. For example, mother obtained a driver's license, a car, and employment. Mother also testified she had been receiving therapy since December 2021. She completed an online domestic violence and parenting class. She participated in various support groups on a voluntary basis and remained clean and sober. Mother admitted having contact with father and speaking to him on the phone every few weeks, but she denied being in a relationship with him. Mother explained she had changed, citing the lack of any verbal or physical violence between her and father, and noting she was able to ask for help from friends or proper authorities to protect herself or M.S. from harm by father.

The juvenile court denied mother's section 388 petition after expressing concern about mother's ongoing relationship with father and finding mother's testimony regarding that relationship not credible. The court determined mother's circumstances were changing, not changed, and the requested reunification services and in-person visits were not in M.S.'s best interests.

After an August 2022 permanency hearing, the juvenile court terminated parental rights. The court found M.S. adoptable. In addition, the court concluded M.S. and mother did not have a beneficial relationship and terminating parental rights would not be detrimental to M.S.

## DISCUSSION

Mother and father make a series of challenges to the juvenile court orders denying mother's modification petition, terminating mother's parental rights, and finding ICWA does not apply. We address each argument below.

# I.

Mother and father contend the juvenile court abused its discretion by denying her modification petition; they argue she demonstrated changed circumstances — her sobriety and participation in domestic violence support groups and Narcotics Anonymous. The court may modify a previous order upon a parent's petition demonstrating by a preponderance of evidence there are changed circumstances or new evidence the modification would promote the child's best interests. (§ 388, subd. (a)(1); *In re J.M.* (2020) 50 Cal.App.5th 833, 845.) "The change in circumstances or new evidence must be of such significant nature that it requires a setting aside or modification of the challenged order." (*In re A.A.* (2012) 203 Cal.App.4th 597, 612.) We conclude the court did not abuse its discretion by denying mother's requested modifications. (*J.M.*, at p. 846 [abuse of discretion review for denial of § 388 petitions].)

While mother has commendably maintained sobriety, employment, and housing, the record reflects the main problem that initially brought M.S. within the dependency system — domestic violence — has not been removed or ameliorated. (*In re A.A.*, *supra*, 203 Cal.App.4th at p. 612 ["The change in circumstances must relate to the purpose of the order and be such that the modification of the prior order is appropriate"].) Given those circumstances, the juvenile court properly declined to modify its prior order bypassing mother for reunifications services. (*Ibid.*) In her modification petition, mother declared she had no intention of being in a relationship with or having any contact with father (who was in prison at the time). But the record demonstrates mother and father had an ongoing relationship since father's February 2022 release from prison.

Mother's case manager and counselor acknowledged mother and father had been together since father's release. Mother admitted she recorded a March 2022 video of the two sitting in a car, smoking, and listening to music together. A few months later, when father was arrested for possession of a firearm, police observed mother and father walking together at an intersection by mother's home. A July 2022 sheriff department report on father's electronic home monitoring system indicated he was registered to mother's address. Police in Pacifica identified mother as father's girlfriend. To the extent mother proffered innocent reasons for these interactions and denied they evidenced any romantic relationship, the juvenile court deemed much of her testimony not credible. We defer to that determination on appeal. (*In re I.B.* (2020) 53 Cal.App.5th 133, 156.)

Mother's continuing relationship with father is significant and concerning. We acknowledge there is "enormous difficulty in separating from a controlling and dominating abuser." (*In re I.B., supra,* 53 Cal.App.5th at pp. 154, 156 [" 'many abuse survivors attempt to leave a violent relationship *five to seven times* before they are able to fully do so' "].) Laudably, mother created a support system, and she participated in therapy where she discussed domestic violence and methods to protect herself. But there is little evidence indicating mother understands what is necessary to permanently leave father. (Compare with *id.* at p. 157 [finding changed circumstances in domestic violence case where mother permanently ended toxic relationship with father].) Unlike the mother in *I.B.*, who separated from the father for eight months despite his offers of assistance, mother's initial separation from father in this case was largely the result of his incarceration. (*Id.* at p. 156.) Although there have been no incidents of domestic violence with father since his release from prison, Agency social

7

workers expressed concern mother was falling back into a familiar cycle with father.

According to the Agency social worker, mother's completion of an online domestic violence course — a course she already completed when she filed a prior section 388 modification petition — was insufficient to address her extensive history of domestic violence at the hands of father and other partners. Mother reportedly stated she learned to simply not talk back to father. Relatedly, mother was involved in another relationship in January 2022 with a man who kicked in her door several times and threatened her with violence. While mother sought assistance and obtained a restraining order against him — which is worthy of praise — this evidence does not compel a finding mother's circumstances significantly changed. (*In re Carl R.* (2005) 128 Cal.App.4th 1051, 1072; compare with *In re J.M.*, *supra*, 50 Cal.App.5th at p. 846 [significant change in circumstances established where mother "had resolved the domestic violence underlying the initial dependency petition," "had not been in contact with [the father] for over a year," and "had completed all required domestic violence training, and nothing suggested [she] was or had been in another potentially violent or abusive relationship"].)

More importantly, even if we conclude mother demonstrated changed circumstances, mother and father have not demonstrated the requested modifications are in M.S.'s best interests. After reunification services have been terminated, a parent's interest in the care, custody, and companionship of the child is subordinate to the child's need for permanency and stability. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) At that stage in the dependency proceeding, "there is a rebuttable presumption that continued foster care is in the best interest of the child." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)

The court "must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child." (*Ibid.*)

Mother's conclusory statement that her family would provide M.S. with a safe and loving relationship fails to satisfy her burden. (*In re Justice P.* (2004) 123 Cal.App.4th 181, 192 [the "presumption favoring natural parents by itself does not satisfy the best interests prong of section 388"].) While mother has certainly demonstrated she loves M.S., there is nothing indicating how reinstating reunification services supports M.S.'s need for permanency or stability. M.S. has been in the same foster home since April 2020 — nearly three years. He is only familiar with his foster home, and the Agency's social worker expressed concern regarding any disruption from this continuity of care. (*In re J.C.* (2014) 226 Cal.App.4th 503, 526 [removal of child from foster home, the only stable home the child has known, after two and one-half years would be detrimental to child's best interests].) M.S. identifies his foster parents as "mama" and "papa" and looks to his foster mother for his everyday needs. The Agency reports M.S. is emotionally bonded with the foster parents, who want to adopt M.S. and provide him with a stable home. (*Ibid.* [identifying the minor's bond with foster family when assessing whether proposed modification served the child's best interests].)

At this point in the proceedings — on the brink of a section 366.26 permanency planning hearing — M.S.'s "interest in stability was the court's foremost concern and outweighed any interest in reunification." (*In re Edward H.* (1996) 43 Cal.App.4th 584, 594 [warning against delaying selection of a permanent home for a child to see if mother could effectively separate from the father would not have promoted stability for the children].) Denying mother's modification petition was not an abuse of discretion.

9

## II.

Mother and father contend the juvenile court erred when it found the beneficial relationship exception did not apply and refused to implement a lesser permanent plan instead of terminating mother's parental rights. We disagree.

At a section 366.26 permanency hearing, the juvenile court must select and implement a permanent plan, such as adoption, guardianship, or long-term foster care, for the dependent child. (§ 366.26, subd. (b); *In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C.*).) First, the court determines whether there is clear and convincing evidence the child is likely to be adopted. (§ 366.26, subd. (c)(1); *Caden C.*, at p. 630.) Upon making that finding, and if there has been a previous determination reunification services should be terminated, the court must terminate parental rights and order the child placed for adoption. (*Caden C.*, at p. 630; *In re Celine R.* (2003) 31 Cal.4th 45, 53 [the "Legislature has thus determined that, where possible, adoption is the first choice"].) But if a parent demonstrates that terminating parental rights would be detrimental based on an enumerated statutory exception, the court should reject termination and select another permanent plan. (*Caden C.*, at pp. 630–631; § 366.26, subds. (c)(1)(B)(i)–(vi), (c)(4)(A).)

One exception, the parental-benefit exception, applies where parents have maintained regular visitation with the child and the child would benefit from continuing the relationship. (§ 366.26, subd. (c)(1)(B)(i).) More specifically, it "applies in situations where a child cannot be in a parent's custody but where severing the child's relationship with the parent, even when balanced against the benefits of a new adoptive home, would be harmful for the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 630.) The parent must demonstrate three elements by a preponderance of evidence: regular

visitation and contact with the child; a relationship that, if continued, would benefit the child; and terminating parental rights would be detrimental to the child. (*Id*. at p. 629.) We review the first two elements for substantial evidence but review the ultimate decision on "whether termination of parental rights would be detrimental to the child due to the child's relationship" with the parent for an abuse of discretion. (*Id*. at p. 640.)

There is no dispute mother maintained regular visitation and contact with M.S., the first element. Mother initially missed a few visits with M.S., but she thereafter had been consistent with her monthly virtual visits. (*Caden C.*, *supra*, 11 Cal.5th at p. 632 [first element examines whether parents visit consistently as allowed by court orders].)

But, as the juvenile court determined, there is insufficient evidence M.S. would benefit from continuing the relationship with mother, the second element. (§ 366.26, subd. (c)(1)(B)(i).) Mother points to evidence that she bonded with M.S. early in his life, as well as testimony from her brother and sponsor that she was an attached, loving parent who attended to all of M.S.'s needs. She also notes her virtual visits with M.S. have always been appropriate during which she engaged in age-appropriate activities, such as singing, teaching him the alphabet, and referring to him in endearing terms. We do not doubt mother's steadfast affection for M.S., but the "focus is the child" not mother. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) When examining this second element, courts may properly consider "how children feel about, interact with, look to, or talk about their parents." (*Ibid*.)

M.S. has spent most of his life in foster care. (*Caden C.*, *supra*, 11 Cal.5th at p. 632 [proper factors for assessing beneficial relationship include the amount of time spent in the parent's custody].) While the parental benefit exception does not require M.S. have a primary attachment

11

to mother, there should be a "substantial, positive emotional attachment" to her. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) Little evidence of such an attachment exists here. M.S. may enjoy his monthly visits with mother, but there is nothing in the record indicating he missed her or talked about her outside those times. There was no change in his behavior before or after these visits, or if a visit was canceled. (Compare with *In re S.B.* (2008) 164 Cal.App.4th 289, 298 [minor displayed strong attachment to father, including being unhappy when visits with father ended].) The Agency social worker reported M.S. appeared indifferent to mother and did not display an emotional connection to her. (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1230, fn. 5 ["social worker assessments and evaluations should address whether or not the children have a substantial, positive, emotional attachment to the parents"].) Sufficient evidence supported the juvenile court's finding M.S. would not benefit from continuing the relationship with mother.

Finally, viewing the evidence most favorably in support of the juvenile court, it did not abuse its discretion in determining there was insufficient evidence M.S. would suffer detriment if mother's parental rights were terminated, the third element. (*In re Stephanie M.*, *supra*, 7 Cal.4th at p. 318.) M.S. refers to his foster parents as "mama" and "papa," and he seeks comfort and reassurance from them. (*Caden C.*, *supra*, 11 Cal.5th at p. 633 [noting courts must determine, "in effect, what life would be like for the child in an adoptive home without the parent in the child's life"].) The Agency social worker noted terminating the relationship "would be beneficial for his long-term safety, permanency, and well-being." On this record, where M.S. lacks a significant, positive, emotional relationship with mother, the benefit of placing M.S. in a new adoptive home outweighs the harm of terminating the relationship with mother. (*Ibid.*)

## III.

Mother and Father argue, and the Agency agrees, the Agency did not conduct an adequate inquiry under ICWA, which establishes "minimum standards for state courts to follow before removing" children who are members or are eligible for membership in an Indian tribe "and placing them in foster care or adoptive homes." (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1048; 25 U.S.C. § 1903(4); § 224.1, subds. (a), (b).) We agree as well.

Mother reported in December 2019 that she may have Indian ancestry but did not specify the tribe. Father similarly reported he had Indian ancestry, but also did not identify a tribe. The Agency served notices on the U.S. Department of the Interior, Bureau of Indian Affairs (BIA). After the BIA responded, stating the notice contained insufficient information to determine tribal affiliation, the juvenile court determined ICWA does not apply. The Agency repeated this finding in its section 366.26 permanency hearing report.

But the juvenile court and Agency have an "affirmative and *continuing* duty to inquire whether a child" who is subject to a juvenile dependency petition, "is or may be an Indian child." (§ 224.2, subd. (a), italics added.) Despite being in contact with M.S.'s maternal aunt and maternal uncle — both of whom testified at mother's section 388 modification hearings — the Agency did not ask them about any Indian heritage as required as part of its initial ICWA inquiry. (§ 224.2, subd. (b) [inquiry includes asking extended family members whether the child may be an Indian child]; *id*, subd. (e)(2)(A) [extended family member includes aunt or uncle].) This failure precludes the court from making an ICWA finding. (*In re Josiah T.* (2021) 71 Cal.App.5th 388, 408 [evidence insufficient to support court's ICWA determination where

13

county welfare department made an inadequate inquiry and reporting deficiencies].)

Contrary to the Agency's assertions, this error was not harmless. Authority is split on how to assess prejudice from ICWA inquiry errors. (See, e.g., *In re G.H.* (2022) 84 Cal.App.5th 15, 32 [deficient initial ICWA inquiry requires reversal per se]; *In re Dezi C.* (2022) 79 Cal.App.5th 769, 779, review granted Sept. 21, 2022, S275578 [deficient ICWA inquiry is harmless unless the record contains information suggesting a reason to believe the child is an Indian child]; *In re A.C.* (2021) 65 Cal.App.5th 1060, 1069 [error is harmless unless the record demonstrates, or parent affirmatively asserts on appeal, Indian heritage].) The issue is currently being reviewed by the California Supreme Court in *In re Dezi C.*, *supra*, at p. 769. For the purposes of this appeal, we adopt the approach in *Benjamin M.* — a "court must reverse where the record demonstrates that the agency has not only failed in its duty of initial inquiry, but where the record indicates that there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child." (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 744.)

We do so because "[r]equiring a parent to prove that the missing information would have demonstrated 'reason to believe' " — as in *In re Dezi C.* — "would effectively impose a duty on that parent to search for evidence that the Legislature has imposed on only the agency." (*Benjamin M.*, *supra*, 70 Cal.App.5th at p. 743.) And automatic reversal in all cases where an agency erred is not "consistent with the state harmless error rule." (*Ibid.*) Moreover, the presumptive affirmance rule would allow appellate courts to make findings of fact regarding a child's Indian heritage on appeal, a power that should be exercised sparingly and in exceptional circumstances. (*In re K.H.* (2022) 84 Cal.App.5th 566, 612.) It would further unreasonably shift

14

the burden of investigation onto the parents and fail to serve the interests of Indian tribes. (*Id*. at p. 614.) Specifically, it "does too little to incentivize agencies to conduct proper inquiries" since inadequate inquires will remain "uncorrected if the parent is unwilling or unable to make a meaningful proffer on appeal." (*In re Dezi C., supra,* 79 Cal.App.5th at p. 785, rev.gr.)

Applying the analysis in *Benjamin M.*, there was readily obtainable information here. The Agency could have spoken to M.S.'s maternal aunt and uncle who could have provided information likely to shed light on whether there was reason to believe M.S. is an Indian child. (*Benjamin M., supra,* 70 Cal.App.5th at p. 744.) The relatives' knowledge of their own Indian status would be suggestive of mother's. (*Ibid*.) Even though we have no information on how either the aunt or uncle would answer the questions, their answers are "likely to bear meaningfully on the determination at issue." (*Id*., at p. 745.) We reject the Agency's argument that mother and father failed to affirmatively assert extended relatives had information to determine M.S.'s possible Indian ancestry. The "duty to develop information concerning whether a child is an Indian child rests with the court and the [Agency], not the parents or members of the parents' families." (*In re Antonio R.* (2022) 76 Cal.App.5th 421, 430.) The ICWA inquiry errors were not harmless.

## DISPOSITION

The juvenile court's order terminating parental rights is conditionally reversed. The matter is remanded to permit the Agency and the court to comply with the inquiry and notice provisions of ICWA and California law.

15

If the court finds M.S. is an Indian child, it shall conduct a new section 366.26 hearing and all further proceedings in compliance with ICWA and related California law. If the court concludes ICWA does not apply, its section 366.26 order shall be immediately reinstated.

_____

Rodríguez, J.

WE CONCUR:

_____

Fujisaki, Acting P. J.

_____

Petrou, J.

A166035

17